[Crim. No. 4061.   Second Dist., Div. Three.   June 23, 1947.]

THE PEOPLE, Respondent, v. SAMUEL D. COLLINS, Appellant.

George Stahlman for Appellant.

Fred N. Howser, Attorney General, and Henry A. Dietz, Deputy Attorney General, for Respondent.

KINCAID, J. pro tem.—Defendant was charged by information with two counts of abortion and one count of murder, felonies. Count I charged the commission of an abortion on

the person of one Crystal Louise Hawkins, on or about July 3, 1945. Count II charged the commission of an abortion on the person of one Helen Thompson on or about June 29, 1945. Margie F. Wilson was charged as being the victim of the crime of murder under count III on or about July 27, 1945. Each count of the information contained the additional charge of a prior conviction of abortion, a felony. Defendant pleaded not guilty to all counts and denied the prior conviction, but subsequently, and before the trial, admitted the prior conviction of abortion as charged. Following a trial by jury defendant was convicted of each of the crimes as charged in the information, and following a denial of his motions for a new trial he now appeals therefrom and from the judgments of conviction. Among other grounds of appeal defendant contends that the evidence is insufficient to sustain the verdicts and judgments. Such being the case, a review of the evidence relied upon by the prosecution to support the verdicts and judgments is necessitated.

Mrs. Crystal Louise Hawkins, a married woman and the mother of other children, was living in the same house with Mrs. Helen Thompson. On July 3, 1945, accompanied by Helen, she went to defendant's combination home and office in Los Angeles by virtue of a previously made appointment with him. A sign over the front porch of the residence and fully visible from the street read: "Dr. S. D. Collins, D. C." Helen introduced Crystal to defendant, whereupon he took her alone into an adjacent office where Crystal told him that she was pregnant and did not want the child. Defendant then asked her if she knew how much it would cost and she thereupon paid him and he accepted the sum of $50. Defendant, while she was there, made no record of the transaction or any case history, but gave Crystal a piece of paper upon which to write her name and address, which she did. Defendant thereupon took Crystal upstairs into a bedroom, telling her to remove her underclothing, whereupon she was taken into an adjacent room which was fitted out with an examination table, a sink, a smaller table and cabinets with various instruments in them. After placing her upon the examining table defendant internally examined her private parts, telling her that she had been pregnant four months. After the examination she heard some metallic sound, he inserted something in her which felt like small scissors but from which she felt no pain. He then packed her internally with cotton, using an instrument therefor. Defendant told

her she could remove the packing the following morning. Crystal then went downstairs, met Helen who had been waiting for her, and proceeded to her mother's home. On the following day the packing came out without assistance by her, together with a long rubber tube with a string attached to it. She thereupon passed blood and a partly-formed fetus. She became seriously ill, went to bed, and for about a month bled heavily and passed tissue. On August 4, 1945, she telephoned defendant, made an appointment with him and went to his office, arriving there about 2:30 p. m. She then told him that Helen Thompson, the subject of count II against defendant, was in the hospital. Some conversation ensued and defendant said that they would not do anything to him except revoke his license.

Law enforcement officers had previously planted concealed microphones in defendant's residence, one in the office downstairs, and the other in his upstairs office that has been heretofore described. Recording instruments were set up in a nearby house. Police officers had been listening to conversation through this source for several days, and Officer Lynn Slaten and Lorna Adams, a district attorney's shorthand reporter, testified, the latter from her transcribed notes, as to conversations heard over their instruments which took place in defendant's residence. Slaten had known defendant for some months and knew and recognized his voice through this apparatus. The substance of their testimony is that about 2:20 p. m., August 4, 1945, they heard defendant's doorbell ring and although part of the ensuing conversation which then took place between a man and a woman was indistinguishable, the woman's voice said something about blood poisoning. The man said "did you give my name? . . . in the first place she came to me . . . I told her her uterus is not good . . . I don't think she would tell. She has a lot of fortitude . . . have you seen her to talk to her?" Woman: "I talked to her Wednesday." Man: "You tell her I appreciate it. She is a good little woman . . . I took care of her." Woman: "I thought possibly they were going to scare her into it." Man: "Just tell her that they can't do a thing. Even if she did talk they could arrest me and cause a lot of trouble." Woman: "After all, you would be willing to save her life, I guess."

Crystal was then again examined by defendant and he found her to be bleeding heavily. He again packed her in-

ternal organs but removed the packing because of the heavy bleeding. Defendant then advised Crystal that he must take her to the Georgia Street Receiving Hospital, not to bring his name into it but to tell that she had inserted the packing herself. Slaten, having heard this conversation, left the equipment and proceeded to the receiving hospital to await the coming of defendant and Crystal. They arrived a few minutes later and Crystal fainted en route from defendant's automobile to the receiving room and was carried in. She was then examined by Dr. George W. Nador, M. D., at the receiving hospital, who diagnosed her condition as an abortion one month ago, and that she had a ''perforated uterus hemorrhaging into the abdominal cavity. Instrumentation twenty minutes ago, severe primary anemia, mild shock.'' The resident physician at the General Hospital, Dr. Hill, testified that his examination brought substantially the same diagnosis, including an induced abortion. The hospital records were likewise introduced in evidence.

After leaving Crystal at the receiving hospital, Officer Slaten and defendant returned to the latter's house where they were met by other police officers. They all proceeded to the second floor treatment room where photographs of that room and others were made which were introduced in evidence. A pan at the end of the treatment table was partially filled with blood and tampons. Surgical instruments, including catheters, a bottle of ergot, a bottle of pills, and other articles there located were confiscated. The telephone in the residence, with an extension to the treatment room, was noted to be number Exposition 6551. The surgical instruments were described by Dr. Frank R. Webb as being of a type primarily used in obstetrical cases; that ergot is used to cause contraction of the muscles of the wall of the uterus, and in large doses can be used to create an abortion. Crystal was the mother of a previous child and she knew of no reason why she could not have another baby.

With reference to count II, the evidence discloses that on June 29, 1945, Mrs. Helen Thompson, the mother of four children, visited defendant at his office-home, having previously made an appointment with him by telephone. She had known defendant for about three years. Her health was good at this date, excepting for some nausea. She told defendant she was pregnant and asked him if he would take care of her. He took her to his upstairs office, told her to

take off her underclothing and she thereupon proceeded into the room which she and Crystal identified as being the same room in which they were each aborted by defendant. After placing her upon a large table, defendant took an instrument in his hand that looked like a pair of scissors, which he inserted in her vagina, and which she could feel. Defendant told her she was hard to work on. She was on the operating table about 30 to 45 minutes. Defendant thereupon inserted a tampon in her vagina. He used no gloves during any of the times he worked on her. Immediately after the operation Helen paid defendant $50 and was told by him that she would pass the fetus. A few days thereafter she did pass a fetus at her home, while Crystal Hawkins was present. Helen continued to hemorrhage for about a month, when she again visited defendant at his office. He again inserted an instrument in her vagina and took hold of something within her. He gave her medicine in a bottle from which she took a dose, and he told her to take it each morning. She continued to hemorrhage and subsequently went to the General Hospital, remaining there for 10 days. She returned to her home for three days but again was compelled to go to the hospital because of continued hemorrhaging. She was treated by Dr. Wilbert Hill, M. D., at the hospital, and the hospital records were introduced in evidence. Dr. Hill diagnosed Helen's condition as an incomplete septic-induced abortion. She was treated for infection of the uterus.

As to count III, the evidence shows that Margie F. Wilson and one John Michael Delyi lived and slept together for about five or six weeks prior to Margie's death which occurred on July 27, 1945. On July 18, 1945, they attended a dance together, were weighed and he saw that she weighed 112 pounds. Some confusion exists in the testimony of Delyi as to specific dates of visits he and Margie made to the office of defendant, but the following are apparently the dates meant by him after a calendar was called to his attention. On the night of Sunday, July 22, 1945, he noticed a little blood on Margie's underclothing, and she was sick and vomiting on that day. On the morning of Monday, July 23, 1945, after having slept the preceding night with Margie, Delyi observed the bed and it was clean of any blood spots, nor had he seen any such spots previously. Margie told him she was going to look for a doctor and on July 23d, they went to defendant's office-residence. They met defendant and he took Margie to

some other part of the building while Delyi waited for her about twenty or twenty-five minutes, when she returned. Later that day Margie became quite ill, vomited, and was very weak and feverish. Later that evening Delyi observed blood spots on the sheets and her underpants were full of blood. He bought extra sanitary pads for her which she used. The following morning, July 24th, they arose from their bed and he observed more blood on the sheets and much blood in her underpants. He then took Margie to defendant's office, she went inside and returned in about fifteen minutes. They slept together again that night, and on the morning of July 25th, he observed blood all over the bed and on her clothing. He then drove Margie to defendant's office again and told defendant that Margie was very ill, whereupon defendant told him to drive his car into the driveway at the side of the house. He carried Margie into the house and defendant then took her into another room and told him to wait. Some twenty-five minutes later defendant and Margie returned and she seemed to feel better and was walking alone. Delyi urged defendant to get Margie into a hospital. Defendant said he knew of a rest home in Pasadena but to wait and see how she was and that it would not be necessary for Delyi to bring her back to see him. On the next day Margie was very weak and he again drove her to defendant's office and parked in the driveway. Margie was too weak to get out of the car, so Delyi told defendant that she was very sick and that he would have to do something about it. Defendant then gave Delyi some brown pills from a big jar, putting them into an envelope. Delyi later identified this jar of pills which the police took from defendant's office. Defendant also gave Delyi some sleeping pills for Margie. Defendant then went out to the car, felt Margie's pulse and forehead, lifted up her robe, looked at her and remarked, "everything is all right. It is clean." Delyi again insisted on taking Margie to a hospital but defendant said she was all right and to give her lots of juices, to wait until the next day to see how she was and to feed her juice by a teaspoon from a can of ordinary tomato juice the defendant gave Delyi. He asked defendant what was wrong with Margie but received no answer. He returned Margie to their home, carried her into the bed, attempted to feed her the pills and juice, but she regurgitated them. She continued to grow weaker and about midnight became extremely weak. About 3 a. m. on July 26th, Delyi dialed the telephone number, Exposition 6551, which number he had ob-

tained from Margie earlier in the evening and which number corresponds with that on defendant's telephone. He talked with defendant and asked him to come to the house immediately because Margie was very ill. While he was describing the location the landlady interrupted, telling him that Margie had died. He then advised Collins of this fact and demanded that he come out to help him as he was going to call the police. Defendant promised to come, but never appeared.

On July 27, 1945, Dr. Frank R. Webb, Chief County Autopsy Surgeon, performed an autopsy on the body of Margie F. Wilson. He testified her weight was then 94 pounds and that she was a perfectly normal person with no apparent reason why she could not have a normal childbirth. Upon opening the abdomen he found an acute peritonitis. The uterus showed severe infection and evidence of recent pregnancy, although the fetus and membranes had been removed. The cervix was swollen, bruised and deeply hemorrhagic, and upon the left wall he found a partial puncture of the cervical wall. This area was bathed with pus. The condition of the infection was probably of only a few days duration and it had spread from the puncture wound in the cervical canal to the oviduct, ovary, and to the peritoneal cavity. The immediate cause of death was acute peritonitis due to septic endometritis following abortion.

Some five days later Delyi went to defendant's office and defendant told him, "I am glad that you told the police what I did," and to "just keep calm and cool and don't worry about nothing." He further told him to take it easy, that he shouldn't worry, and that he should take a trip, that he should take a vacation, and that if he wanted to take a trip he would help him whenever he was ready to go. Defendant further stated that he, defendant, should have changed his license plates because he had a little trouble before and the police were looking for him. Later that same day, at the request of Officer Lucas, Delyi telephoned Collins, made an appointment with him, went to his office and there told him he was going to take a trip and asked defendant if he could help him out. Defendant thereupon handed him $25, telling him that if he wanted to move from his residence he could and to take it easy and rest. Delyi also asked defendant what was the matter with Margie. The defendant made a gesture and replied, "If you don't know I won't tell you."

On July 30, 1945, defendant telephoned Captain Thad Brown, of the Los Angeles Police Department, who had known defendant for some twelve years. Defendant said he understood Brown wanted to talk with him and that he supposed it was about that girl who was brought to his office in a car but denied that she was ever in his office. Defendant was apprehended on August 4, 1945, when he brought Crystal Hawkins to the receiving hospital.

The defendant failed to take the witness stand and offered no defense evidence whatsoever. As a chiropractor, defendant was not licensed to practice surgery or to prescribe drugs, although the evidence discloses that he did both. (*People* v. *Collins*, 4 Cal.App.2d 86, 87 [40 P.2d 542].)

█ The testimony of Crystal Hawkins as to count I, required corroboration under section 1108 of the Penal Code, which provides that a defendant cannot be convicted for procuring or attempting to procure an abortion upon the testimony of the woman upon or with whom the offense was committed unless she is corroborated by other evidence. █ Each may corroborate the other, however, and the mere fact that Helen accompanied Crystal and Delyi accompanied Margie to defendant's office does not make them accomplices. (*People* v. *Wilson*, 25 Cal.2d 341, 346 [153 P.2d 720].) So far as Delyi is concerned, this is the only part he played in the transaction with the defendant. "So long as corroborating evidence creates more than a suspicion of guilt, it is sufficient even though it 'be slight and, when standing by itself, entitled to but little consideration.' . . . It may consist of . . . inferences from the circumstances surrounding the criminal transaction . . . and it need not establish the precise facts testified to by the witness whose testimony it supports." (*People* v. *Wilson, supra,* p. 347.)

█ As to counts I and II it was incumbent upon the prosecution not only to prove that certain acts had been done which resulted in an abortion, but also that these acts were performed not for a lawful purpose, but with the intention of causing an abortion. (*People* v. *Coltrin*, 5 Cal.2d 649, 656 [55 P.2d 1161].) █ As to count III it was necessary for the prosecution to establish by competent evidence that the decedent died due to an operation performed upon her which was criminal in character. It was further incumbent upon the prosecution to prove the intent with which the act or acts were done.

As was said in *People* v. *Clapp*, 67 Cal.App.2d 197, 201 [153 P.2d 758] : "Where a felonious intent is an essential ingredient of the crime and the accused claims that his act was accidentally, mistakenly or innocently done, or where the circumstances might support an inference that the act was lawful, it is proper practice to rebut such claim or inference by evidence of other criminal acts done by the accused, in which he used similar means and which produced the same result, in order to prove the criminal purpose that actuated the deed for which the prisoner is on trial. . . . In such circumstances evidence of another crime is relevant if it logically tends to prove the intent of defendant in the offense under investigation although it·might prove a distinct crime and prejudice the defendant before the jury. . . . Such proof is especially permissible where the act charged is not in itself proof of the required criminal intent and other evidence of intent is necessary to complete the proof." Under the circumstances here existing the evidence as to each of the charged crimes may be used in support of the proof as to the others as such evidence logically tends to prove the intent of the defendant as to the particular offense under investigation.

The evidence, taken as a whole, provides the requisite corroboration, shows that the acts performed by defendant on the three women who are the subjects of the respective counts in the information were not necessary to preserve their lives, that such acts were performed with the intent to unlawfully abort them and resulted in the causing of an abortion as to each of them. As to count III, such evidence, together with the inferences reasonably deducible therefrom, supports the implied finding by the jury that Margie F. Wilson died due to an operation performed upon her by defendant which was of a criminal character. Defendant strongly urges that, because the evidence discloses a little blood to have been seen on the decedent's underclothing on the night before her first visit to defendant and she was sick and vomiting on that day, the inescapable conclusion is that she had been subjected to instrumentation by someone else prior to her coming to defendant. This, however, was only one of many conflicting inferences which could be drawn from the evidence and the finding of the jury thereon is conclusive. The evidence fully sustains the verdicts and ·judgments appealed from.

We find no merit in the contentions of defendant that the testimony of Lorna Adams, the district attorney's stenog-

rapher who listened in and took notes over the concealed microphone equipment, was improperly admitted into evidence. (See *People* v. *Pustau*, 39. Cal.App.2d 407, 414 [103 P.2d 224].) Nor do we find any prejudicial or reversible error in the refusal to give or in the giving of certain instructions to the jury or in admitting the defendant's catheters and surgical instruments into evidence.

The judgments and orders denying the motions for new trial are affirmed.

Shinn, Acting P. J., and Wood, J., concurred.

A petition for a rehearing was denied July 8, 1947, and appellant's petition for a hearing by the Supreme Court was denied July 22, 1947.