[Crim. No. 4697.   Second Dist., Div. One.   Mar. 24, 1952.]

THE PEOPLE, Respondent, v. MORRIE BROWNSTEIN et al., Appellants.

Bradley Solomon, Max Solomon and Henry C. Huntington for Appellants.

Edmund G. Brown, Attorney General, and Elizabeth Miller, Deputy Attorney General, for Respondent.

DRAPEAU, J.—By information, defendants were jointly charged with the crime of conspiracy to engage in bookmaking, a violation of subdivisions 1, 2, 3, 4, and 6 of section 337a, Penal Code. Thirteen overt acts were therein alleged. The

jury found defendants guilty as charged. Motion for new trial was denied as to each defendant; proceedings were suspended and defendants were granted probation subject to certain named conditions.

Defendants Brownstein, Joffe and Norby appeal from the order denying their motion for new trial and as well from the judgment of conviction. Defendants Horn and Rinck appeal from the order denying motion for new trial.

Since no judgment was pronounced, the purported appeals from the judgment of conviction must be dismissed. (*People* v. *Steccone,* 36 Cal.2d 234, 235 [223 P.2d 17].)

█ It is here contended that the evidence is insufficient to establish the charge of conspiracy.

"The gist of the crime of conspiracy, under section 182 of the Penal Code, is the unlawful agreement between the conspirators to commit an offense prohibited by the statute, accompanied by an overt act in furtherance thereof. The conspiracy may be established by circumstantial evidence. (*People* v. *Black,* 45 Cal.App.2d 87 [113 P.2d 746]; 5 Cal. Jur. 497, § 3.) It is not necessary to prove by direct evidence the express agreement between the co-conspirators. That agreement may be inferred from the action and conduct of the defendants in mutually carrying out a common purpose in violation of the statute. (*People* v. *Montgomery,* 47 Cal. App.2d 1, 11 [117 P.2d 437]; *People* v. *Yeager,* 194 Cal. 452 [229 P. 40]; *People* v. *Jones,* 136 Cal.App. 722 [29 P.2d 902]; Underhill's Crim. Ev. p. 1401, § 773.)'' (*People* v. *Benenato,* 77 Cal.App.2d 350, 358 [175 P.2d 296].)

The facts giving rise to the instant prosecution are briefly the following:

On November 4, 1950, appellant Brownstein leased Apartment A at 8499 Fountain Avenue, Los Angeles, at a certain agreed rental, paying the first and last months' rent. He was given a key to the mailbox located on the west wall of the entry to the apartment.

Late in the afternoon of December 6, 1950, Police Officer Mullins was seated in a parked car across the street from the apartment. At 6 o'clock, he saw appellant Brownstein drive up, park his car and enter the apartment; at 6:10 appellant Joffe drove up and went into the apartment carrying a package which he took from the rear of his car. A few minutes later an unidentified man entered the apartment. At half past six Brownstein left, and 20 minutes later Joffe and the unidentified man also left.

On December 14, 1950, at 8:45 a. m., Officer Mullins with Officers Brookes and Foster were staked out on the north side of Fountain Avenue where they could see the entrance to the Brownstein apartment. At 9:15 that morning, appellant Rinck parked her car near the entrance and went into the entry alcove of the apartment. She stayed a few minutes, returned to her car and drove to 1501 North Ogden Drive where she entered the house. That afternoon about 4:15, the three officers drove to the Ogden Drive address and saw appellant Rinck leave there around 4:45 and drive to the Brownstein apartment on Fountain Avenue. She was carrying some papers. One of them appeared to be a California Digest, a paper of limited circulation which lists horseracing information for each day that horses are running in the United States. She went into the apartment, stayed a few minutes and then drove away. At 5:45, appellant Joffe left the apartment and got into an automobile parked across the street. Officer Mullins placed him under arrest and took from his pocket a white envelope containing lined cards and a California Digest of December 15, 1950. With appellant Joffe in tow, the officers went into the Brownstein apartment. After forcing the lock, they searched the mailbox where they found several white envelopes. Two of these contained copies of California Digest all dated December 15, 1950. On the face of another envelope the initials ''N.B.'' were written. Inside were a number of cards. In the opinion of Officer Mullins, these were professional type betting markers showing that the bookmaker's agent was ''N.B.'' This envelope also contained an adding machine tape with the same figures as those written on the markers.

In the fourth envelope were some ruled cards and a piece of adding machine tape. Officer Mullins testified that these were professional betting markers and the figures on the tape corresponded to the figures at the bottom of the betting markers. A fifth envelope contained betting markers and a copy of California Digest for December 14, 1950, which had been marked to show the results of the races listed thereon and the amounts paid for a $2.00 bet on horses that came in first, second and third.

In the Brownstein apartment, the officers found a wrapped package of blank betting markers, a bag of ruled cards numbered one to twenty under some paper in a drawer. In a desk in the bedroom were five sheets of ruled paper numbered one to twenty on the left-hand side. In a desk in the living room,

they found a telephone index and a small blue notebook. The index contained the telephone numbers of appellants Horn, Norby and Joffe. The notebook contained a list of names at the top of the pages, and names and figures below. In the opinion of the officer, as accounting is carried on by bookmakers in Los Angeles County, the name of the agent would ordinarily be listed at the top of the page and the names of betters listed below. Also, financial arrangements between the betters and their agents would be shown. In the opinion of Officer Mullins, who was familiar with words, symbols, paraphernalia and language used by bookmakers, the notations under the names of agents indicated that the betters listed were to receive credit for an indicated percentage of all money bet by them when the notation was "H & C," and for the indicated percentage of money lost when the notation was "losers."

When questioned by the officers, appellant Joffe stated he had known appellant Brownstein for fifteen years, and that he was in the apartment to totalize the sheets and distribute them to the various envelopes; that he had been employed for about two weeks by a man named "Mac" to totalize the markers; that he entered the apartment with a key which had been left for him, so that he could pick up the sheets and deliver them to various stated locations. When asked if "Mac" was not Mr. Brownstein, Mr. Joffe declined to answer any more questions.

At 6:30 p. m. on December 14th when appellant Horn arrived at the apartment, he was placed under arrest. Upon search, a key to the mailbox was found on his key chain. This he claimed was a key to his luggage. He also stated that he was a salesman and had come to the apartment to see appellant Joffe about some shirts; that he had known Mr. Joffe for several years, and Mr. Brownstein since they were "kids on the east side."

Appellant Brownstein arrived at the apartment about 6:45 p. m. He had a small brown address book in his pocket which contained letters corresponding to initials found on the envelopes and on the betting markers. In the opinion of Officer Mullins, this was similar to "set-ups" used by persons engaged in bookmaking in Los Angeles; that the pages were owe sheets and the letters at the left indicated the days of the week, to wit: M, T, W, T, F and S, and the amounts written opposite the letters indicated the amount of money owed to or by betters.

When asked by the officers "Why do you let these men come to your house and use it for their bookmaking operations?" appellant Brownstein replied, "They are friends of mine and they can come here any time they want." He said he could not account for any of the betting paraphernalia found in his apartment by the officers.

Appellant Norby came to the apartment at 7 p. m. When searched, a key which opened the lock on the apartment mailbox was taken from him along with two small pieces of paper. Officer Mullins testified that the names listed on the left-hand side of the first piece of paper indicated the names of betters; that the figures indicated the amount of money owed by the agent to the betters. That the second sheet was an owe sheet showing amounts of money to be paid to or by an agent. That the name Morrie at the top of the owe sheet indicated the name of an agent. Appellant Norby told Officer Mullins that he had gone to the apartment to check the sheets to see if he had won on bets placed by him that day; that the key which the officers took from him was a key to the mailbox where he got his sheets.

At 8:45 the next morning, i. e., December 15, 1950, the three officers returned to the Ogden Drive address. While waiting outside the building, they saw appellant Joffe go in. About 12:30 p. m. the officers entered the house and found appellant Joffe standing near a table upon which were a California Digest, a telephone and papers containing pencilled notations which were of a type commonly used by bookmakers. The officers remained in the house for an hour and a half to two hours, during which period the telephone rang a number of times. Officer Mullins answered each call and the person calling would identify himself. The officer took wagers on horses running or purporting to run on that day. He asked appellant Joffe why he had gone to the Ogden Drive address. Joffe answered that he had gone there to collect $20 owing to him by Mac, and that the betting markers and the California Digest had been left on the desk for him.

On the same day Officers Mullins and Brooks had a conversation with appellant Rinck. They asked her about her bookmaking activities. She said she had heard about the arrest of the other four appellants from Max Brownstein that morning, and "I figured that you made my handwriting from yesterday's sheets, from the phone spot, which was on Ogden Drive. . . . I have worked for Morris Brownstein for about two weeks. I get $100 a week and he has paid me twice

personally.'' Also, that she worked at the phone spot on North Ogden Drive on the 8th 9th, 11th, 12th, 13th and 14th of December, 1950. Officer Mullins explained that a ''phone spot'' is a place ''in which there is a telephone and someone answers the telephone as it rings, and from the betters that call in they record the wagers that the betters call in on professional betting markers.''

Thirteen exhibits, i. e., cards, betting markers, Calfornia Digests, telephone lists, etc., were introduced in evidence, all of which were identified by Officer Mullins as paraphernalia commonly used by bookmakers in Los Angeles County. Also, an examiner of questioned documents identified the handwriting on such documents as that of one or more of the appellants.

There was ample evidence from which the jury could, and did, infer that a conspiracy had been formed by appellants pursuant to which telephone wagers on horseraces were to be taken at the Ogden Drive house; that a complete record of the wagers was kept on betting markers and the results of races noted on the California Digests; that these were placed in the mailbox at the Brownstein apartment on Fountain Avenue to be picked up by agents who had keys to the mailbox; that these agents collected and paid the amounts indicated on the betting markers and accounted to the bookmakers for such amounts collected and paid.

The evidence established that appellant Brownstein rented and maintained the Fountain Avenue apartment and the mailbox there for the purpose of bookmaking; that appellants Joffe and Horn met Brownstein there; that they both had keys to the mailbox and their names and telephone numbers were listed in the telephone index found in the apartment. Also that appellant Rinck drove back and forth between the apartment and the Ogden Drive house and deposited papers in the mailbox. When appellant Norby was apprehended in the apartment on the evening of December 14th, he had a key to the mailbox in his possession; his name or initials appeared on the bookmaking paraphernalia found in the apartment, all of which raised the inference that such paraphernalia had been left there for him and that he had been furnished with a key in order to pick up the documents for distribution.

A conspiracy to violate section 337a of the Penal Code was definitely established; also, that each appellant was active in such conspiracy, performing duties assigned to him in carrying out its purpose.

For the reasons stated, the order denying motions for new trial is affirmed. The appeals from the purported judgment are dismissed.

White, P. J., and Doran, J., concurred.