Filed 6/21/16  P. v. Culver CA2/5

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FIVE

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>KENNETH WAYNE CULVER,<br><br>    Defendant and Appellant. | B263188<br><br>(Los Angeles County<br>Super. Ct. No. MA064702) |

APPEAL from orders of the Superior Court of the County of Los Angeles, Frank M. Tavelman, Judge.  Affirmed.

Linda L. Gordon, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Gerald A. Engler, Chief Assistant Attorney General, Lance E. Winters, Senior Assistant Attorney General, Amanda Lopez , Deputy Attorney General, for Plaintiff and Respondent.

_____

Defendant and appellant Kenneth Culver was convicted by jury of three controlled substances-related offenses[1] and three weapons and ammunition-related offenses.[2] The jury found that the controlled substances-related offenses were committed for the benefit of, at the direction of, and in association with a criminal street gang within the meaning of Penal Code section 186.22, subdivision (b)(1)(A).[3] Defendant admitted suffering two prior convictions as defined in section 667, subdivision (a), and the three strikes law (§§ 667, subds. (a)-(d) and 1170.12, subds. (b)-(i)). The trial court struck one of the prior convictions and sentenced defendant to 29 years in state prison.

Defendant contends on appeal that the evidence is insufficient to support the finding that he committed the crimes for the benefit of a gang, because the gang expert's testimony was based on recordings of conversations which were not played for the jury. We conclude the gang expert properly based his opinions on recorded statements made by defendant and others, and that substantial evidence supports the gang allegations. We affirm.

FACTS

On the afternoon of May 1, 2014, defendant was driving a car registered to his girlfriend Iris McKenzie. McKenzie was riding in the front passenger seat. Mike Stebleton was seated in back. Defendant pulled into Stebleton's driveway in Lancaster.

---

[1] Defendant was convicted in count 1 of transportation of methamphetamine (Health & Saf. Code, § 11379, subd. (a)), in count 2 of possession of methamphetamine for sale (Health & Saf. Code, § 11379, subd. (a)), and in count 3 of possession of hydrocodone for sale (Health & Saf. Code, § 11351, subd. (a)).

[2] Defendant was convicted in count 4 of unlawful possession of ammunition (Pen. Code, § 30305, subd. (a)(1)), and in counts 5 and 6 of felon in possession of a firearm (Pen. Code, § 29800, subd. (a)(1)).

[3] All further statutory references are to the Penal Code unless otherwise stated.

Deputy Sheriff Larry Pico and his partner pulled up behind the car. Deputy Pico knew defendant to be a member of a gang called Young Boys Rifa (YBR) with a moniker of "Cartoon." Deputy Pico had 14 years experience as a deputy sheriff. He worked at Men's Central Jail for four years, where he interviewed hundreds of Southern California gang inmates about their habits, drug use, weapon use, and drug sales. He has been assigned to the Lancaster Community Assessment Program Team (LANCAP) for the past three years primarily patrolling apartment complexes in Lancaster, specifically in high crime areas, for drug sales and gang activity. LANCAP conducts independent investigations, as well as responding to calls. Deputy Pico has participated in more than 100 narcotics investigations.

Deputy Pico walked to the driver's door and said, "What's up, Mr. Toons?" Defendant replied, "What's up, Deputy?" The deputies conducted a parole compliance check, determined that both passengers were on probation, and there was a warrant out for Stebleton's arrest. The deputies found a box containing bags of methamphetamine, marijuana, and pills, including Vicodin. They also found a digital scale, boxes of 9 millimeter and .45 caliber ammunition, and several cell phones. Defendant said the ammunition belonged to him. The previous summer, he had shot a Browning 9 millimeter handgun and a silver .45 caliber automatic handgun with a friend.

Defendant's phone had a photo of defendant with Arutyan Kazaryan, another member of YBR who had been arrested for methamphetamine sales. In the photo, defendant and Kazaryan each had an arm around the other and were using hand gestures that Deputy Pico recognized as YBR hand signs. Defendant also had photos of a rifle and a revolver. He had a photo taken at a grave site showing a shirt or sweater with the words R.I.P. Lazy, Y.B.R. 13. "13" shows a gang's affiliation with the Mexican Mafia.

There were several text messages on defendant's phone. One stated, "Need a sack. You interested in the silver pimp C cup?" According to Deputy Pico, that message referred to a sack of marijuana or methamphetamine and offered to trade an item for the drugs. Another text stated "how much can you give me a quarter for." Deputy Pico stated this related to the sale of seven grams of methamphetamine, worth $100 to $200.

3

There were multiple similar messages from people seeking to buy methamphetamine. Deputy Pico testified that YBR operates in the area of East Palmdale. YBR's main business is drug sales, particularly methamphetamine. In addition, the gang members sell weapons and engage in identity theft. Deputy Pico has investigated YBR and its members. Deputy Pico has had four contacts with defendant since 2006, and defendant presented as a member of YBR each time. Deputy Pico investigated Kazaryan for a few months and arrested him for methamphetamine sales.

Copies of the pictures and texts from defendant's phone were shown to the jury and admitted into evidence. Defendant's e-mail address begins "toonsybr."

Detective Roger Izzo testified as the prosecution gang expert. After basic training in gang investigations, he interacted with gang members at a custody facility and later on patrol in Lancaster. He became a training officer at the Lancaster station. He was on the LANCAP team for five years as a deputy sheriff. After that, he taught classes to new deputies. He rewrote a gang class that he taught to custody deputies and two narcotics classes which also related to gangs. In 2010, he returned to Lancaster as a gang investigator. He worked as a robbery assault detective and on a burglary suppression team. He returned to LANCAP as a detective. He has testified in more than 100 cases as an expert in the possession for sale of controlled substances.

Detective Izzo investigated YBR for a year before defendant was arrested in this case. YBR's main business is narcotic sales, primarily methamphetamine and heroin, and it is also involved in weapons sales, assaults and thefts. Defendant has the tattoo "YBR" on the back of his head. In addition to the tattoo on defendant's head, he has the words "Young Boys" tattooed across his abdomen and he has YBR tattoos on his arm. Defendant would let his hair grow out if he wanted to disassociate himself from the gang. In a telephone call to an associate, defendant bragged that he had tagged YBR and Cartoon in the sheriff's transport bus and in jail cells. This showed he was still actively advertising his gang affiliation.

4

Detective Izzo began listening to Kazaryan's in-custody telephone calls after Kazaryan was arrested for methamphetamine sales.[4] Detective Izzo listened to hundreds of hours of Kazaryan's telephone calls from custody. On April 1, 2014, Kazaryan called Sophie Martinez from custody. Martinez used a second cell phone to call defendant. Listening to a recording of Kazaryan's call, Detective Izzo could hear and identify defendant's voice from the second phone. Detective Izzo is very familiar with defendant's distinctive voice. He could not always hear what defendant was saying, but some parts of the conversation were very clear.

The parties to the conversation on April 1, 2014, discussed prices that Kazaryan could get from inmates to buy drugs from defendant and what defendant would give if he got better prices on the street. Kazaryan said he would get defendant a certain price for drugs, and defendant needed to buy a prepaid credit card and send the numbers to Kazaryan in custody. Detective Izzo testified that the activity benefitted YBR.

Detective Izzo testified that if a YBR gang member in custody calls another YBR gang member who is not in custody to discuss prices for the sales of controlled substances and prepaid credit cards for purchases, both gang members would be participating in that transactional activity for the purpose of benefitting YBR. Kazaryan spoke about raising himself up in the gang. If defendant supplies Kazaryan with money in custody and Kazaryan gets defendant better prices for drugs, defendant is able to bring

_____

[4] Defense counsel objected on hearsay grounds to Detective Izzo testifying about recorded conversations that were not going to be played for the jury. The court expressed concern that the testimony was prohibited by Evidence Code section 1523, which states that oral testimony is not admissible to prove the content of a writing, and in turn, Evidence Code section 250 defines a writing to include a recording. The People argued Detective Izzo's testimony was not prohibited by the hearsay rule, because the recorded statements were admissions by the defendant. Detective Izzo would only be testifying about statements made by defendant. In addition, a gang expert can testify to the meaning of a recorded statement after the foundation has been laid. The trial court allowed the testimony, finding that it was not being offered for the truth of the statements, but for the limited purpose of the detective's opinion about the defendant's gang affiliation.

5

in more money which he can use to help his fellow gang member in custody. In this way, both gang members benefit from the narcotics sales.

Detective Izzo also reviewed numerous recorded telephone calls that defendant initiated after his arrest. Defendant primarily called McKenzie. He discussed drug sales for the purpose of benefitting YBR members. His focus was to keep McKenzie supplied with drugs so she could send him money.

Detective Izzo explained the daily life of a gang member is to sell drugs and support the other members of the gang, including the people in custody. Gang members do not go to a day job to make legitimate income that they pass to their friends or use to buy stuff for people in custody. They sell drugs illegally to keep the gang functioning. In Detective Izzo's opinion, based on his background, training and experience as a narcotics officer, if a member of a gang who is participating in the gang's narcotics activity is driving with a significant amount of controlled substances in quantities for the purposes of sale, the gang member is moving the narcotics for the benefit or aid of the gang.

In response to defense questioning on cross-examination, Detective Izzo discussed relationships between YBR gang members and the members of other gangs to smuggle drugs into jail. On redirect examination, he stated defendant directed McKenzie to work with another YBR gang member named Michael Ayala. Ayala was subsequently arrested and pled guilty to selling methamphetamine with a gang allegation that he was doing it for the benefit of YBR.

DISCUSSION

Statutory Framework and Standard of Review

Section 186.22, subdivision (b)(1) authorizes a sentence enhancement when the defendant "is convicted of a felony committed for the benefit of, at the direction of, or in association with any criminal street gang, with the specific intent to promote, further, or

6

assist in any criminal conduct by gang members[.]"  "The substantial evidence standard of review applies to section 186.22 gang enhancements.  [Citations.]"  (*People v. Augborne* (2002) 104 Cal.App.4th 362, 371.)

Expert Testimony

Defendant contends Detective Izzo's expert testimony lacked foundation, because it was based on recordings of telephone conversations that were not played for the jury, and therefore, the gang enhancement is not supported by substantial evidence.  This is incorrect.

"California law permits a person with 'special knowledge, skill, experience, training, or education' in a particular field to qualify as an expert witness (Evid. Code, § 720) and to give testimony in the form of an opinion (*id.*, § 801).  Under Evidence Code section 801, expert opinion testimony is admissible only if the subject matter of the testimony is 'sufficiently beyond common experience that the opinion of an expert would assist the trier of fact.'  (*Id.*, subd. (a).)  The subject matter of the culture and habits of criminal street gangs, of particular relevance here, meets this criterion.  [Citations.]"  (*People v. Gardeley* (1996) 14 Cal.4th 605, 617 (*Gardeley*).)

"Evidence Code section 801 limits expert opinion testimony to an opinion that is '[b]ased on matter . . . perceived by or personally known to the witness or made known to [the witness] at or before the hearing, whether or not admissible, that is of a type that reasonably may be relied upon by an expert in forming an opinion upon the subject to which [the expert] testimony relates. . . .' (*Id.*, subd. (b).)"  (*Gardeley*, *supra*, 14 Cal.4th at p. 617.)

"Expert testimony may also be premised on material that is not admitted into evidence so long as it is material of a type that is reasonably relied upon by experts in the particular field in forming their opinions.  [Citations.]  Of course, any material that forms the basis of an expert's opinion testimony must be reliable.  [Citation.]  For 'the law does not accord to the expert's opinion the same degree of credence or integrity as it does the

7

data underlying the opinion.  Like a house built on sand, the expert's opinion is no better than the facts on which it is based.'  [Citation.]"  (*Gardeley*, *supra*, 14 Cal.4th at p. 618.)

"So long as this threshold requirement of reliability is satisfied, even matter that is ordinarily inadmissible can form the proper basis for an expert's opinion testimony.  (*In re Fields* (1990) 51 Cal.3d 1063, 1070 [expert witness can base 'opinion on reliable hearsay, including out-of-court declarations of other persons']; see Fed. Rules Evid., rule 703, 28 U.S.C.; 2 McCormick on Evidence, *supra*, § 324.3, pp. 372–373.)  And because Evidence Code section 802 allows an expert witness to 'state on direct examination the reasons for his opinion and the matter . . . upon which it is based,' an expert witness whose opinion is based on such inadmissible matter can, when testifying, describe the material that forms the basis of the opinion.  (*People v. Shattuck* (1895) 109 Cal. 673, 678 [medical expert could testify to patient's complaints in order 'to give a clinical history of the case to understand the significance of her symptoms']; *McElligott v. Freeland* (1934) 139 Cal. App. 143, 157–158 [certified public accountant could testify to information he relied on in property valuation]; see *People v. Wash* (1993) 6 Cal.4th 215, 251 [prosecution could elicit out-of-court statements relied on by the defense expert]; 2 McCormick on Evidence, *supra*, § 324.3, p. 372 [explaining that under rule 703, Fed. Rules Evid., which allows the expert to disclose to the trier of fact the basis for expert opinion, '[t]he result is that often the expert may testify to evidence even though it is inadmissible under the hearsay rule.'].)"  (*Gardeley*, *supra*, 14 Cal.4th at pp. 618-619.)

"A trial court, however, 'has considerable discretion to control the form in which the expert is questioned to prevent the jury from learning of incompetent hearsay.'" (*People v. Price* (1991) 1 Cal.4th 324, 416.)  A trial court also has discretion 'to weigh the probative value of inadmissible evidence relied upon by an expert witness . . . against the risk that the jury might improperly consider it as independent proof of the facts recited therein.' (*People v. Coleman* (1985) 38 Cal.3d 69, 91.)  This is because a witness's on-the-record recitation of sources relied on for an expert opinion does not transform inadmissible matter into 'independent proof' of any fact.  [Citations.]" (*Gardeley*, *supra*, 14 Cal.4th at p. 619.)

We reject defendant's argument that Deputy Izzo's expert testimony was inadmissible or insufficient to establish the truth of the gang allegation on the theory the recorded conversations were not played for the jury. Detective Izzo personally listened to the recorded calls and recognized defendant's voice, providing the necessary foundation. (See *People v. Sica* (1952) 112 Cal.App.2d 574, 586-587 ["testimony of a witness who recognizes a voice and uses this identification to name the speaker is properly admissible [citations] and any uncertainty of the recognition goes only to the weight of the testimony"]; *People v. Lorraine* (1938) 28 Cal.App.2d 50, 54 [foundation for voice identification is "proof of recognition of his voice, or by any other circumstances which satisfactorily indicate the identity of the individual"].) The prosecution was under no obligation to play the recordings, which were taken from 100s of hours of recordings. The foundation for Deputy Izzo's testimony was established by his uncontradicted testimony that the calls were made by Kazaryan using his inmate number and he was familiar with defendant's voice and recognized it on the recorded calls. Defense counsel was in possession of copies of all the recordings, and was free to play any recording that contradicted Deputy Izzo's testimony, but did not do so. The trial court specifically invited a challenge to Deputy Izzo's interpretation of the calls, stating, "the defendant is certainly free to ask the detective what specific quotes he's referring to, what specific tape it was, what specific time stamp on the tape it was. Anything the defense believes necessary for purposes of independently verifying, explaining what the detective is relying on . . . ." There is substantial evidence that the crimes in this case were committed for the benefit of a gang and no error has been shown.

Even without Detective Izzo's testimony regarding the recorded conversations, it is not reasonably probable that a result more favorable to defendant would have resulted. Defendant displayed gang tattoos that demonstrated active gang membership. His phone had pictures with other gang members and messages about drug transactions. He answered to his gang moniker. Detectives Pico and Izzo both testified that YBR's primary activities included drug trafficking. The only reasonable inference from the evidence presented was that defendant committed the crimes for the benefit of the street

9

gang.  Given this record, even if the court should have excluded Detective Izzo's testimony about defendant's statements in recorded conversations, any error was harmless under the state standard for prejudicial error.  (*People v. Watson* (1956) 46 Cal.2d 818, 834.)

DISPOSITION

The judgment is affirmed.

KRIEGLER, J.

We concur:

TURNER, P.J.

RAPHAEL, J.*

---

\* Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.