[Crim. No. 5085.   Second Dist., Div. Three.   Feb. 3, 1954.]

THE PEOPLE, Respondent, v. ROLAND NOCITA, Appellant.

Joseph T. Forno for Appellant.

Edmund G. Brown, Attorney General, and Martin M. Ostrow, Deputy Attorney General, for Respondent.

VALLÉE, J.—Defendant was found guilty of bookmaking. Proceedings were suspended and he was granted probation. No final judgment of conviction was rendered. ██ An order granting probation is deemed to be a final judgment, and a defendant may appeal therefrom. (Pen. Code, § 1237.) Defendant appeals from the judgment and from the order denying his motion for a new trial. He contends the evidence is insufficient to support the finding that he was guilty and the court erred in the admission of evidence.

In the late afternoon of November 1, 1952, four police officers stationed themselves outside defendant's residence. They watched the premises for about 20 minutes and then two of them approached the front door. Through the window they observed defendant sitting at a table making notations on small, white cards. There were several white cards on the table. The officers knocked; defendant opened the door; and the officers identified themselves. When they did so, defendant left the front door, proceeded to the rear of the house, and the officers had "to use restraining force to keep him at the premises." The officers found these articles in the house: on the table, the National Daily Reporter for November 1, 1952, several small pieces of white cards with notations on them, two pieces of paper, each entitled "Nation's Football Forecasts," which corresponded to the lower half of the white cards, "a hand telephone number 6266," several pencils, and a ball point pen; in the kitchen in a circular tin can, two National Daily Reporters, one dated

October 31, 1952, the other November 1, 1952, in each of which were "several professional type betting markers" with notations thereon and tally sheets attached; on the dining room table and in a bureau in the dining room, several pads of "professional type betting markers."

A betting marker usually shows the number or name of the horse bet on; the amount of money bet; whether for win, place, or show; the bettor's name or initials; and in many cases the name of the agent or bookmaker who received the bet. The betting markers in the National Daily Reporter of October 31, 1952, bore notations of that character on horses running that day, and those found in the National Daily Reporter of November 1, 1952, bore notations of that character on horses running on that day. An expert identified the National Daily Reporters as scratch sheets. In some instances the scratch sheets indicated whether a horse had won, placed or showed. The expert testified that the marks were made by a person making book.

The Nation's Football Forecasts is comparable, with respect to football games, to the National Daily Reporter, as applied to horse races. It showed that about 51 football games were being played throughout the country on November 1, 1952. An expert testified that a bettor would place an "X" after the team he bet on; he could select three teams in three different games, and should the three win, he would be paid five for one; he could select any number of teams and bet one dollar. The markers, in evidence, were perforated, the upper and lower half bore the same number, the bettor had kept the upper half, the lower half was "retained by the bookmaker." The lower half bore the bettor's name, the teams selected, and the bet.

The pencil writing on the betting markers found in the National Daily Reporter of October 31, 1952, was that of defendant. An expert was unable to identify the writing on the betting markers in the National Daily Reporter of November 1, 1952, as that of defendant.

While the officers were in the house the telephone rang several times; one of them answered. He testified that a female voice was on the line, that she said: "'This is the Smoke Shop. Is Roland [defendant's given name] there?' I stated, 'No, Roland has gone out.' And she said, 'All right, I will call back.'" He testified that in the next call a female voice was on the line and this conversation took place: "'This is Cleo. Is Roland there?' and I stated no, that Roland had

gone out, 'But I am taking the phone and everything is all right.' She stated, 'I just wanted the results of the races. I will call him back or he can call me.' She gave me a number; I have it as 29240. And I stated, 'All right,' and we hung up.'' He also testified that a male voice called and this conversation occurred: '' 'This is Charlie. How did I do today?' I stated, 'What on?' He stated, 'On the football bets.' I stated, 'Well, I think you won.' He stated, 'How about the action?' I stated, 'The horse action?' He said, 'Yes.' I stated, 'I think you won on that too,' and he stated, 'All right, I will talk to Roland,'—He asked for Roland, incidentally.—'when he comes in.' I told him he had gone out''; and that there were several other similar telephone calls.

Defendant told one of the officers that the pencil notations at the bottom of the betting markers and inside the National Daily Reporter for October 31, 1952, and on slips attached to the white cards, were in his handwriting; he was employed by a man named ''Art'' at a salary of $50 a week to total the bets; ''Art'' came by in the evening after five, left the cards, and returned the following day to pick them up after he (defendant) had totaled them; that he did not know who ''Art'' was.

Defendant testified he lived in the house which the officers entered. He met ''Art'' in a saloon in Compton. The National Daily Reporter of October 31, 1952, and its contents were left with him by ''Art'' the night prior to the visit of the officers. He did not see the National Daily Reporter of November 1, 1952, or its contents; that it must have been left that morning. In addition to being a relief bartender, he did semiaccounting work. He had several accounts. He did not know ''Art's'' last name. He made the arrangements to do the work the last week in October. The night before he was arrested was the first time ''Art'' had left anything. He tabulated the night prior to his arrest and could see that the figures were bets on horse races and football games. He ''had known that he [Art] was a bookie, from coming into the place, and I didn't believe there was any harm in tabulating sheets.'' There are no recordations of bets in his handwriting on the material found by the officers. The tabulations were the only things he made. The Racing Form belonged to himself or his wife. When ''Art'' delivered the material the morning the officers visited him, he (Art) told him he was going to be gone for the week end, that he would

be back Sunday evening or Monday morning to pick up his tickets and that he had left his (defendant's) telephone number with people to call up "to find out as to how their figures were for the day." In addition to doing the totaling he had to know "who was winning what and who was paying what." He did not try to run away when the officers came.

Penal Code, section 337a, subdivision 1, provides that every person who engages in bookmaking is guilty of a public offense. Bookmaking is the making of a book of bets. To engage in is to be occupied in, to be employed in. (*People* v. *Coppla,* 100 Cal.App.2d 766, 768 [224 P.2d 828].) Without analysis of the evidence we have related, it is enough to say that there was substantial evidence to support the conclusion that defendant was engaged in making a book of bets on horse races and football games. (*Cf. People* v. *Cohen,* 107 Cal.App.2d 334 [237 P.2d 301].)

Defendant's testimony alone is sufficient to support the finding of guilt. He admitted he knew "Art" was a "bookie," that the materials he used in his computations were records of bets; but he thought that there would be no harm in tabulating the sheets. On this testimony, he aided and abetted "Art" in the making of books on horse races and football games. All persons concerned in the commission of a crime, whether they directly commit the act constituting the offense, or aid and abet in its commission, are principals in the crime so committed and are punishable as such. (Pen. Code, §§ 31, 971.)

Insofar as the question whether the evidence is sufficient to support the finding of guilty of bookmaking is concerned, *People* v. *Coppla,* 100 Cal.App.2d 766 [224 P.2d 828], relied on by defendant, is not analogous. In Coppla the defendant had a number of sealed envelopes with betting markers in them. It was held there was no evidence that the defendant knew the contents of the envelopes or that he was aiding and abetting a bookmaker.

Defendant asserts the court erred in admitting the testimony of the officer as to the telephone conversations. His counsel did not object to the testimony, hence the point may not be considered. (*People* v. *Ines,* 90 Cal.App.2d 495, 500 [203 P.2d 540].) Even without the testimony as to the telephone conversations, the evidence is sufficient to support the finding of bookmaking.

The judgment and order appealed from are affirmed.

Shinn, P. J., and Wood (Parker), J., concurred.