[Crim. No. 5162. Second Dist., Div. One. July 29, 1954.]

THE PEOPLE, Respondent, v. CHARLES H. CAHAN, Appellant.

Russell E. Parsons for Appellant.

Edmund G. Brown, Attorney General and Elizabeth Miller, Deputy Attorney General, for Respondent.

WHITE, P. J.—In an information filed by the district attorney of Los Angeles County, defendant was charged in Count I with the violation of Penal Code, section 337a, subdivision 1; in Count II with the violation of subdivision 2 of the same code section; and in Count III with a violation of subdivision 4 of the aforesaid section. Trial by jury was duly waived. Evidence was presented to the court by the People and defendant, following which presentation defendant was adjudged guilty as charged in each count of the information. His motion for a new trial was granted as to Count III, and denied as to the remaining two counts. He was sentenced to the county jail for a term of six months on each of the two counts, I and II, the sentences to run concurrently. From the judgments of conviction and the order denying his motion for a new trial, defendant prosecutes this appeal.

As to the factual background surrounding this prosecution the record reflects that on November 29, 1952, defendant was occupying an office in a building at 3180 West 6th Street, in the city of Los Angeles. About noon of that day, Officers Arnest and Binstein of the Los Angeles Police Department, were in the hallway outside of the office occupied by defendant. There was no name on the door. Officer Binstein was on his knees, and Officer Arnest was above him, and both were looking through a mail slot approximately 2 inches by 8 inches, which was in the door, on its hinged side, and the closing of which they had drawn aside. They saw defendant sitting at a desk talking into a telephone, and they could hear what he said. They remained there for about 15 minutes, and during that time they heard the telephone in the office ring four or five times, and heard defendant answer it and carry on conversations. When the telephone rang for about the fourth time, the officers heard defendant talking. He mentioned a couple of horses and said, "I will handle the horses for you. I will take care of them for you." He then said, "Raymos what?" "Raymos Fizz? How do you spell that?" "In the third, Raymos Fizz." "Sea Garden in the 6th, and Stranglehold in the eighth." "What was that? How do you spell that? Yeah, Stranglehold." "O.K., I got them." "20 and 20." "O.K., I've got it, Raymos Fizz in the third, Sea Garden in the sixth, Stranglehold in the eighth, 20 and 20. O.K." At the time defendant was carrying on this conversation, he was writing.

A minute or so later, Officer Arnest started to kick the door

in, while Officer Binstein remained looking through the slot in the door. At the first kick, defendant grabbed the paper that was on the table, crumpled it in his hand, and threw it into the corner. At the second or third kick the door opened. and Officer Arnest entered. Officer Binstein got up off his knees and entered in a crouched position. Defendant said, "Shoot", and Officer Binstein drew his gun. Officer Arnest searched defendant, and then Officer Binstein replaced his gun in its holster.

Officer Arnest had a conversation with defendant in which he identified himself and asked defendant if he was making book. The latter said that he was not. The officer asked, "What did you do with the action?" and defendant said, "I don't know what you're talking about." Arnest said "I just saw you write something down after hearing you take some action over the phone. What did you do with the action?" to which defendant replied, "I don't write anything down. You won't find anything written here. I keep everything in my head. I have got a very big brain." As he said this, "he patted his rump." Officer Binstein went to the corner of the office in the direction in which he had seen defendant throw the paper, and found there a wastebasket containing two pieces of paper, each rumpled up in a ball. He handed them to Officer Arnest, who read them and said, "This is what I heard you say and saw you writing." Defendant said, "I don't know anything about it." Officer Arnest said, "You are making book here?" and the defendant made no reply.

Other papers were found in the office, and others were found in defendant's pockets.

Officer Arnest showed defendant the papers which he had removed from the latter's pocket and asked him what they were. Defendant said, "Well, you can see what they are. You should know what they are." Officer Arnest said, "Well, they look like basketball pools to me," and defendant replied, "Well, that's what they are." Officer Arnest asked, "Are you making book on basketball and football, too?" and the defendant answered, "No. I just follow the sport." The officer said, "Well, this other marker here has some names of football teams on it. Are you taking action on football games as well?" and defendant did not answer.

Officer Arnest had been a police officer for 12 years, and connected with the vice unit for a year and a half. He had studied bookmaking at the police department's in-service training school, and had talked to bookmakers and police of-

ficers with experience in making bookmaking arrests and investigations. He had made 40 or 45 bookmaking investigations and as many arrests, and had had occasion to testify in court about bookmaking activities approximately 35 times.

On one of the pieces of paper which Officer Binstein had taken from the wastebasket, there was writing, ". . . third, Remus Fizz," on one line, below that, "20 dash, and then the next line 6, Seagarden, followed by 20 dash, and the next 8, . . . Stranglehold." Officer Arnest compared the document with a newspaper and found the horses mentioned on the document were running on the day of the arrest. In the opinion of Officer Arnest, the word "Third" indicated the third race at Tanforan for the 29th of November of 1952. The words "Remus Fizz" indicated the name of a horse running in the third race at Tanforan. The numeral 6 indicated the sixth race at Tanforan. The word "Seagarden" indicated the name of a horse running in the sixth race at Tanforan. The numeral 8 indicated the eighth race at Tanforan, and the word "Stranglehold" indicated the name of a horse running in the eighth race at Tanforan on November 29, 1952. The numerals 20 and 20 indicated the amount of money wagered on those horses. In the opinion of the officer the paper was a betting marker.

The other piece of paper recovered from the wastebasket had on it writing which appeared to be "900 Navy . . 7 . . . then a line, then some word, partially scratched out, and below that ten thirty, 500, and then . . T - e - n - n - 10." In the opinion of Officer Arnest the word "Navy" was the name of the Navy football team, the numeral "7" following it indicated the number of points given or taken, the number "900" was the time the bet was taken, the number "220" was the amount of money wagered on the bet, the numerals 10.30 indicated the time that the bet was taken, the numerals "500" indicated the amount of money wagered, the name "Tenn" indicated the name of the Tennessee football team, and the number "10" indicated the amount of points given or taken. Officer Arnest looked at a newspaper for the day, and found that the Navy and Tennessee teams were playing games that day. His opinion was that the paper was a betting marker on a football game.

One of the papers taken from the defendant's pocket was, in the opinion of Officer Arnest, a professional football scratch sheet, which was printed for the purpose of indicating who was playing, on what dates, and the amount of points or odds on

each team for the purpose of wagering. On the printed document there were red and blue pen and ink notations opposite some of the printing. In the opinion of the officer, the red writing indicated the number of points to give or take, and the blue the changes in the points scheduled. One of the other papers taken from defendant was in the opinion of the officer, a professional basketball scratch sheet, which gave the names of basketball teams playing throughout the country on various dates, and was used to select and wager bets on basketball teams. A third paper taken from defendant was in the opinion of the officer, an order blank to secure professional type basketball scratch sheets.

On behalf of defendant, John H. Blewett, a public relations man, testified he had known defendant for some three years. That on November 29, 1952, he telephoned defendant at the latter's office between 11 and 11:30 a. m., advising that he was going to San Francisco and inviting defendant to accompany him. That defendant declined the invitation. That they talked for a couple of minutes about some "tips" the witness had received and the latter suggested that if defendant accompanied him they might win some money. That he mentioned two or three horses to defendant. That he did not give the latter a $20 wager on any of the horses. He did not remember the names of the horses. That defendant said nothing about wanting the witness to put any of the money on any of the horses for him.

Defendant himself testified that on the morning of November 29, 1952, he arrived at the corner where his office building was located at about 11 a. m., that he spent about a half hour in the drugstore. He then went upstairs to Room 211, the offices of the Futuristic Advertising Company. That he received a telephone call from the witness John Blewett who asked him to go to San Francisco. That they talked and Mr. Blewett said he had some information on the races that day at the Tanforan Race Track. That Mr. Blewett gave him the names of three horses that were supposed to win. Those names were Raymos Fizz, Stranglehold and Sea Garden. Defendant wrote down the names of the horses on a piece of paper. That he did not make or accept any wager on any of the horses. That another piece of paper contained notations of football games being played that day, with numerals showing the number of points the teams were favored over their opponents, and the amount of prospective wagers. That he did not make the prospective wagers noted.

After looking at the two pieces of paper and thinking about it for a while, he decided not to make any bets that day, and threw them into the wastebasket. He opened some mail, talked over the telephone and read part of the paper. As he was sitting at the desk there was a noise and the door was broken down. That a man came in with a gun in his hand and told the defendant to raise his arms. He did so. The men identified themselves as police officers and told defendant he was under arrest. The officers searched him and the premises. They asked him what he had done with the "action" and he told them he didn't know what they were talking about. They asked him if he was making book, and asked him if he was a bookmaker, and he answered both times that he was not. They asked him about the papers they had taken from the wastebasket, and he told them they were bets that he had intended to make. That he did not say that he kept the "action" in his head. He was not keeping those premises for the purpose of accepting wagers on horse racing or on football games, nor did he record any bet on any piece of paper on that day and was not on that day engaged in bookmaking or pool selling.

Albert Jack Chotiner, an attorney at law, testified that he had been in the city prosecutor's office of the city of Los Angeles from 1926 to 1935. That he had studied the manner in which bookmaking was conducted in Los Angeles County for about 15 years. That he had tried many cases involving the violation of section 337a of the Penal Code; that he had spoken to individuals who had been convicted of bookmaking; that he talked with practically every officer who had worked bookmaking in the last 15 years; that he had studied bookmaking in establishments in Nevada; he had observed the various documents such as betting markers that have been used in this locality and received in evidence in various cases. That one of the papers found in the appellant's wastebasket was, in his opinion, nothing more than a memorandum of the names of three horses with an amount opposite two of them. That betting markers on a horse bet, would contain the name of the horse, the amount of money, how it is wagered, and always contained either the name or initials of the better. That the other piece of paper was a memorandum of the names of two teams which were to play a football game, and a notation of an amount of money wagered or to be wagered on each game. That there was nothing on the weekly football schedule of games to indicate that any money of any kind was wagered on any of the games.

■ As his first ground for reversal appellant contends that the evidence is insufficient to support his conviction on either charge. He asserts that the telephone conversation regarding horses and the slip of paper with writing on it, characterized by the police officer as a betting marker, was shown not to have been in violation of section 337a by the testimony of John Blewett that the latter had telephoned appellant on the morning in question and had given him the names of a couple of horses which he was going to bet on at Tanforan when he got there that afternoon, and the testimony of appellant himself that he had written down the names of those horses, along with figures indicating money which he had considered betting on them, but which he had later decided not to bet. But the testimony of the police officers negatived any such innocent activities as claimed by appellant. If the testimony of the officers be accepted as true there could be no question that a violation of subdivisions 1 and 2 of Penal Code, section 337a, was clearly established.

■ True, the evidence adduced by the prosecution and the defense was in direct conflict, but it is not the function of this court to retry the cause. Our duty is to determine whether the record contains evidence of sufficient substantiality, contradicted or uncontradicted, to support the conclusion arrived at by the duly constituted arbiter of the facts.

Determinative of the problem here presented is the following language used by this court in *People* v. *Von Benson*, 38 Cal.App.2d 431, 434, 435 [101 P.2d 527] :

"The mere fact that this evidence was contradicted by other testimony in the case is not ground for a reversal. No principle is more firmly grounded in our law than that which precludes an appellate court from reversing a judgment for insufficiency of the evidence when there is in the record evidence of sufficient substantiality which, if believed by the trier of fact, would warrant a conviction. For a comprehensive discussion of the limitations surrounding an appellate tribunal on questions of this kind, see *People* v. *Haydon,* 18 Cal.App. 543 [123 P. 1102, 1114]. While it is true that appellant himself testified and denied the accusatory evidence of the prosecution's witnesses, it is a well-established principle of law in this state that although the defendant's own story and that of witnesses, if any, presented in his behalf exculpates him, it is for the jury, or as in the instant case where a jury was waived for the judge, to say whether the defendant's story and those of his witnesses should be believed. (*People*

v. *Rongo,* 169 Cal. 71 [145 P. 1017]; *People* v. *Sears,* 119 Cal. 267 [51 P. 325]; *People* v. *Billings,* 34 Cal.App. 549 [168 P. 396]; *People* v. *Stephens,* 29 Cal.App. 616 [157 P. 570].) In the instant case the decision of the trial judge indicates that he did not believe the appellant's story in denial of what was said by the People's witness. Even though we were to concede that a mere reading of the record in the case might leave one in some doubt on the question of the defendant's guilt, there is certainly enough in the evidence to sustain the conclusion of the trial judge, who saw and heard the various witnesses, and who was in a much better position to determine the truth than a court that does not possess such an advantage.''

■ The charge contained in Count I, viz., bookmaking, means simply the making of a betting book (*People* v. *Bradford,* 95 Cal.App.2d 372, 377 [213 P.2d 37]; *People* v. *Pollack,* 105 Cal.App.2d 581, 585 [234 P.2d 176]). ■ While the violation of subdivision 2 of Penal Code, section 337a, as alleged in Count II is complete when it is proved that the accused occupied a room with paraphernalia used for the purpose of recording a bet. It is the occupancy of the room or enclosure with betting paraphernalia for the purpose mentioned that constitutes the offense, not the actual making of bets, and the purpose for which the premises is being used and occupied need not be established by direct evidence, but may be gathered from all the surrounding circumstances shown by the evidence (*People* v. *Warnick,* 86 Cal.App.2d 900, 902 [195 P.2d 552]; *People* v. *Ines,* 90 Cal.App.2d 495, 499 [203 P.2d 540]; *People* v. *Newland,* 15 Cal.2d 678, 683 [104 P.2d 778]). The conclusion arrived at by the trial court under the facts testified to herein by the police officers, finds abundant support in their testimony hereinbefore narrated.

Appellant next urges that as bookmaking is defined to be ''the making of a book of bets'' (*People* v. *Bradford, supra,* p. 377), therefore, under the facts of this case the conviction of violation of subdivision 1, bookmaking, as charged in Count I of the information would be ''all-inclusive'' and preclude a conviction under Count II for violation of subdivision 2 of the aforesaid Penal Code section to wit, occupying a room with paraphernalia for the purpose of recording bets. With this claim of appellant we cannot agree. ■ The law is well settled that each subdivision of section 337a describes and constitutes a separate offense as if it had been enacted in a separate and distinct section of the code (*People*

v. *Plath,* 166 Cal. 227, 231, 232 [135 P. 954] ; *People* v. *Ghio,* 82 Cal.App. 28, 32 [255 P. 205]). The crime denounced by subdivision 1, Penal Code, section 337a, is bookmaking, with or without writing (*People* v. *Pollack, supra,* p. 585; *People* v. *Bradford, supra,* p. 377), while the crime made punishable by subdivision 2 of the same code section is the occupancy of a room or enclosure with paraphernalia for the purpose of recording a bet or bets. To constitute a violation of this subdivision it is not necessary that a bet be actually made as it is the occupancy of a place equipped with paraphernalia for the purpose of receiving or recording such bets that constitutes the offense (*People* v. *Manning,* 37 Cal.App.2d 41, 43 [98 P.2d 748] ; *People* v. *Gompertz,* 103 Cal.App.2d 153, 159 [229 P.2d 105]). That the same evidence may support a finding of guilt on both counts does not render the respective counts identical, nor necessarily include one within the other as contended by appellant. Had the latter been acquitted on Count I and convicted on Count II, there would have been no inconsistency in the verdict (*People* v. *Smith,* 113 Cal.App.2d 416, 420, 421 [248 P.2d 444]).

Finally, appellant insists that because the charges contained in the information related to horseracing only, it was prejudicial error for the court to admit into evidence a sheet of paper found in the room occupied by him and which in the opinion of a police officer was a betting marker on a football game; also a "Weekly Football Schedule" containing handwritten notations, which in the opinion of the officer was a professional football scratch sheet, and which was removed from the appellant's pocket at the time of his arrest; and a "Weekly Collegiate Basketball Schedule" which was also taken from the appellant's pocket at the same time, and which was in the opinion of the officer a professional basketball scratch sheet giving the names of basketball teams playing on various dates, and which was used to select and wager bets on basketball teams. Appellant insists that such evidence was immaterial and incompetent to establish the charges contained in the information which referred only to horseracing.

Except when it shows merely criminal disposition, the settled law of this state is that evidence which tends logically and by reasonable inference to establish any fact for the prosecution or to overcome any material fact sought to be proved by the defense, is admissible even though it may tend to connect the accused with an offense not included in the charge against him (*People* v. *Woods,* 35 Cal.2d 504, 509

[218 P.2d 981]). █ We perceive no error in the court's ruling. The testimony tended to illuminate the character of the conduct and actions of appellant upon which the primary charges in the information were predicated. The testimony or inferences to be drawn therefrom, tend to shed some light upon whether appellant's actions and conversations on the telephone concerning horseracing were acts of making book on horseraces or merely, as he and the witness Blewett testified, innocent acts of noting prospective bets which appellant might make. The documents were therefore relevant and properly admitted in evidence.

For the foregoing reasons, the judgments and the order denying defendant's motion for a new trial are and each is affirmed.

Doran, J., and Drapeau, J., concurred.

Appellant's petition for a hearing by the Supreme Court was denied August 26, 1954.