[Crim. No. 6741. Second Dist., Div. Three. Feb. 25, 1960.]

THE PEOPLE, Respondent, v. DOMINIC CUDA et al.,
Appellants.

Gerald J. Levie for Appellants.

Stanley Mosk, Attorney General, William E. James, Assistant Attorney General, and Jack E. Goertzen, Deputy Attorney General, for Respondent.

FORD, J.—Each of defendants Cuda, Ciceroni and Trentini appeals from a judgment of conviction of criminal offenses. The appellants, together with others, were charged in count I of the information with the crime of conspiracy to violate section 337a, subdivisions 1, 2, 3, and 4, of the Penal Code, in violation of section 182, subdivision 1, of the Penal Code. In count II of the information, the appellant Cuda was accused of the crime of violation of section 337a, subdivision 1, of the Penal Code, and in count III with the crime of violation of section 337a, subdivision 2, of said code. In count VII, the appellant Ciceroni was charged with the crime of violation of section 337a, subdivision 1, of the Penal Code; in count VIII, he was charged with the crime of violation of section 337a, subdivision 2, of said code; and in count IX, he was accused of the crime of violation of section 337a, subdivision 3, of said code. In count XIII, the appellant Trentini was charged with the crime of violation of section 337a, subdivision 1, of the Penal Code, and in count XV he was accused of the violation of section 337a, subdivision 3, of said code.

Each appellant entered his plea of not guilty. At the time of trial, the appellants duly waived trial by jury. It was stipulated that the cause should be submitted on the testimony contained in the transcript of the proceedings had at the preliminary hearing. Each appellant was found to be guilty as charged except that appellant Ciceroni was found to be not guilty with respect to count VIII.

Since appellants attack the sufficiency of the evidence, it is necessary to state it in some detail. Dorothy Pettigrew, a policewoman, testified that about 11:15 a. m. on or about September 13, 1958, she saw the defendant Ciceroni at a café located at 1135 North Mission Road, Los Angeles. She approached him, addressed him as "Johnny" and told him, "I would like two across the board on Heels A'Flying at Pomona. That is the 5th race at Pomona." He inquired as to the person who had sent her and, to the witness' reply, said, "Oh yeah, I know her." The officer further said, "I want two to win on Speedy Mayhem in the 9th race at Pomona." She handed the defendant one five-dollar bill and three one-dollar bills and he went into a room in the back of the café. The witness testified that Pomona is a race track where horse racing was conducted and that the two horses she had named were horses running at the track on that day. She further testified that on September 19, 1958, she went to a bar, the 1141 Club at 1141 North Mission Road, Los Angeles, at about 10:45 a. m., after having made a record of the serial numbers of three one-dollar bills. She asked for "Johnny" but left when told he was not there. About five minutes later, the witness returned and said to the woman who was acting as bartender, "I can't wait for Johnny because I don't know if he will be back. I want $1 to win and $2 to place on Early Choice in the second race at Bay Meadows," and handed the woman three one-dollar bills. The woman, later identified as Mrs. Morales, said, "You had better write that down." At that time appellant Trentini came up to the officer and said, "No, no, let me have it." He took the money from Mrs. Morales, put it in his pocket and asked the witness what she wanted. She said, "$2 to place and one to win on Early Choice in the 2d race at Bay Meadows." As the witness was leaving the bar, she looked back and observed appellant Ciceroni coming into the bar. She went back and repeated the wager to him. He said, "O. K., I have it." This was in the presence of Trentini. She

testified that Bay Meadows is a race track at which a horse, Early Choice, was to race on that date. She reported what had occurred on the two occasions to Officer Jordan of the administrative vice division and to Officers Guiney and Gastaldo of the Highland Park vice detail. The witness, on further inquiry, testified that she had gone to the 1141 Club at approximately 2 p. m. on September 15, 1958. She talked to appellant Ciceroni who told her, "Your horse came in." He gave her $12 and she said, "Give me $2 to win on Naishapur Lady at Pomona," and handed him two one-dollar bills. Ciceroni put the money in his pocket.

William C. Jordan, a police officer attached to the administrative vice division of the Los Angeles Police Department, testified that on or about September 10, 1958, he conducted an investigation in this matter. He was at 2624 Darwin Street in Highland Park, arriving at about 9 a. m. At 10 minutes after 10 a. m., he saw defendant Del Mariano go into the rear house at that address and emerge at approximately 6:30 p. m. On September 11, at about 10:15 a. m. Del Mariano arrived and went inside. At about 12:05 p. m., the appellant Cuda drove into the driveway and went inside the house. He came out about 20 minutes later and drove away. About 6:35 p. m., Del Mariano left. On the next day, September 12, Del Mariano arrived at approximately 10:15 a. m. and left at about 6:30 p. m. On Saturday, September 13, Del Mariano remained on the premises from about 10:20 a. m. until about 6:35 p. m. The witness, after the parties had stipulated to his qualifications as an expert on the manner and means by which bookmaking is commonly conducted in Los Angeles County, expressed his opinion as to the significance of Del Mariano's times of arrival and departure. He testified that "his arrival coincided with the first post for the eastern tracks and his leaving corresponded to the last post at the local tracks."

Officer Jordan further testified that on September 17, 1958, he conducted an investigation in connection with the case at 525 North Moore in Monterey Park. He was there with Officer Gastaldo. Officer Guiney was at another location in the vicinity. At approximately 9:15 a. m. he observed the codefendant Keith emerge and get into Del Mariano's automobile and drive to a grocery store. She returned to the house. The officers departed after 6:30 p. m. and no one had left the house.

On September 19, at approximately 9 a. m., Officer Jordan was in the vicinity of 6521 Repton in Highland Park. At approximately 10:15 a. m., appellant Cuda came out and got into his automobile. The officer followed him to 2624 Darwin where Cuda went inside, stayed about 10 minutes, and then returned to his home at 6521 Repton. Officer Jordan had been communicating his observations to his fellow officers during the course of his investigation. In his testimony, the officer related the information Officer Deiro had given him prior to the arrest about to be mentioned. On September 19, he arrested Cuda at his home after receiving a radio message from Officer Deiro at about 12:10 p. m. directing him to enter and make the arrest. The witness and Sergeant Foster went to the front door and Sergeant Goldberry and Officer Haire went to the rear. The witness testified that: "We identified ourselves and demanded admittance. Nobody came to the door, so we forced entry." When the witness entered, he observed Cuda seated at a table in the dining room. He further testified that: "There was an adding machine on the table, a pencil, professional type of betting markers with notations. These were on top of a newspaper." In Cuda's coat, which was found in a closet, was $1,003 in cash. The witness identified the markers produced in court as being those which were on the table in front of Cuda. He stated that the pencil notations were recordations of bets on horses running at various tracks throughout the United States on a particular day, September 18. The officer expressed his opinion as to the meaning of various notations on the markers. In his opinion, Cuda was conducting bookmaking activities. As to the type of activity, the witness stated: "Well, Mr. Cuda was totaling the sheets when we entered. These particular sheets are returned to the boss by the person working on the back office, normally. He in turn will add the sheets to see how much money was taken in, how much money was paid out, and how much there is to be collected. On this particular sheet, the one I mentioned before, the top sheet bearing the initials J. J., at the extreme bottom of the sheet appear figures '23800.' Immediately under that '15800,' with a line drawn underneath and then underneath that is a large letter 'C' and then, '8000.' A check of these particular tickets indicates that $238 was the total amount taken in on this particular group of tickets. The total pay amounted to $158. So, the 'C' would indicate to collect. There was $80 to be collected on this particular group of tickets. People's 1A,

the tape in the adding machine found in front of Cuda, at the very top of the tape appear the numerals 23800, which would correspond to the total amount taken in by the book on these particular tickets. Following are a series of numbers which correspond to the action taken on these various tickets, and immediately underneath is '15800' which would indicate the total pay. Subtracting 158 from 238 gives the amount to be collected by the defendant—$80.''

With respect to slips of paper found in Cuda's coat which was in a bedroom closet, the officer testified: ''People's 2 are various sheets of paper bearing penciled notations. The initials 'J. J.' appear on here followed by an 84, 8-4, with the word 'draw' and '2600.' In my opinion, this would indicate that the particular agent J. J. on the particular date, the 8th month 4th day, had drawn 26 from the book. The rest of these sheets are [for a] similar period. They show amounts drawn by the agents from the book and also the amounts owed by the agents and by the bettors to this particular book.''

Officer William M. Guiney testified that on September 17, 1958, he conducted an investigation in connection with this case at 525 North Moore in Monterey Park. He saw codefendant Keith drive away and later return with a large brown paper sack out of the top of which was protruding a white piece of paper upon which were the words, ''National Daily Reporter.'' That publication is commonly referred to as a ''scratch sheet.'' Defendant Del Mariano opened the front door of the house for her. On the next day, both defendants Del Mariano and Keith left before 10 a. m., returned shortly after 10 a. m., and remained there the rest of the day up to the time the officer discontinued his observation at about 6:35 p. m. On the following day, September 19, defendant Keith left shortly before 10 a. m. and returned at about 10:15 a. m. with a brown paper bag out of which was protruding a piece of paper resembling a National Daily Reporter. Later in the day she was watering the lawn and, as she saw the officers approach, she started to run toward the house. She was placed under arrest.

Charles M. Holmes testified that he was a police officer attached to the administrative vice division and worked under the directions of Officer Deiro. He arrested defendant Del Mariano on September 19, 1958, at the time Officer Guiney arrested Mrs. Keith. The witness testified that at that time Del Mariano ''had the National Daily Reporter scratch sheet

which was dated the 19th of September, 1958, and several professional type betting markers which were yellow in color.'' The witness, as an expert, expressed his opinion as to the meaning of notations found on the markers.

Joseph S. Deiro testified that he was a police officer for the city of Los Angeles attached to the administrative vice division and had directed the other officers in connection with the investigation in this case. On September 10, 1958, he observed the defendant Del Mariano meeting with appellants Cuda, Trentini and Ciceroni at approximately 6:45 p. m. outside of the 1141 Club located at 1141 North Mission Road. They entered the 1141 Club and ''would come and go periodically.'' They remained there approximately a half hour. On September 11, 1958, at approximately 11:55 a. m., the officer followed Cuda from a bar at 6001 North Figueroa to 2624 Darwin where Cuda went into the house. Cuda stayed in the house for about 20 minutes and then drove to other bars in the vicinity. At 6:45 p. m. the witness saw Del Mariano meet with Cuda, Trentini and Ciceroni in front of 1141 North Mission Road. At 6:45 p. m. on September 12, he again observed the persons named meeting at the same location. On September 13, the officer accompanied policewoman Pettigrew to the vicinity of the 1141 Club and she went into that place. At 6:45 p. m. of that day, he observed Del Mariano and the three appellants meet in the vicinity of the 1141 Club. Mrs. Pettigrew reported to him what transpired each day on which she entered the premises there and met with appellant Ciceroni. Every evening Officer Deiro and Officers Jordan, Gastaldo and Guiney would get together and discuss the information which they had received during that particular day. On the morning of September 19, the witness and Officers Pettigrew and Gastaldo drove to the vicinity of 1141 North Mission Road and parked in the parking lot of the General Hospital. Gastaldo handed Mrs. Pettigrew three one-dollar bills. Mrs. Pettigrew made a record of the serial numbers and then went into the 1141 Club. She returned about a half hour later and reported what had occurred in the bar. Soon after that, the witness contacted Officer Holmes through the police radio and directed him to effect the arrest of Del Mariano at 525 North Moore Street, Monterey Park. After receiving a report from Officer Holmes that he had found ''professional type'' betting markers at the Monterey Park location, Officer Deiro contacted Officer Jordan through the police radio and instructed him to effect

the arrest of appellant Cuda at 6521 Repton Street. Shortly thereafter, Officer Jordan reported to Officer Deiro that he had arrested Cuda and had found "professional type" betting markers. Prior to the report from Officer Jordan, the witness had checked the telephone company records with reference to the number Capital 2-4433 and found that that number was listed to Russell Sawers at 2317 Johnson Street. Officer Jordan reported that that number had been found to be written on the water heater in the kitchen of the house where Cuda was arrested. The witness contacted Officer Yorkovich through the police radio and told him to effect the arrest of the person who was at the Johnson Street premises. Officers Deiro and Gastaldo then went to 2624 Darwin Street and demanded admittance but received no reply. Finding the front door to be unlocked, the witness entered the house and there found in the kitchen "professional type betting markers in a waste paper basket which was located in the middle of the kitchen floor next to a table which had on it a telephone instrument and pencils." The witness, as an expert, expressed his opinion as to the meaning of the notations on a betting marker there found. The witness, without objection, also expressed his opinion of the operations at the three addresses as follows: "In my opinion, the Darwin Street address was being used as a back office for a call back type bookmaking operation. . . . A call back operation works as follows: A player is given a telephone number which is located at one location. A person is at this location and answers the phone. This is the call back spot. The bettor calls the call back, leaves a name or a telephone number or both or some type of identification and hangs up. The person on the call back records the name or telephone number or identification, or all of these. Periodically, a person on a back office, which is at a different location, calls the call back and receives the telephone numbers or names or both from the clerk on the call back. The clerk on the back office then calls the person who left that telephone number who is a customer and accepts wagers on horses from this person and permanently records them at that time. . . . In my opinion, the Johnson Street location was the front office, which was the call back where the parties would leave their identification and phone numbers. . . . In my opinion, the Moore Street address would be a back office type operation, the back office to a call back operation." On cross-examination, the witness stated in sub-

stance that observation of each of the premises was undertaken because of information given by a confidential informant. The court refused to require the People to disclose the name of the informant.

Officer B. G. Yorkovich testified that he was working under the direction of Officer Deiro. He arrested defendant Russell Sawers at 2317 Johnson Street in Los Angeles. After receiving no response to the demand that the front door be opened, the officers entered through the back door which was unlocked. The witness found no notations on paper which were relevant to bookmaking.

An exemplar of the handwriting of the defendant Del Mariano was received in evidence. It was stipulated that a handwriting expert of the police department would be deemed to have been called and to have testified that he had compared the handwriting on the markers found at 6521 Repton, 525 North Moore and 2624 Darwin with the exemplar and that, in his opinion, such handwriting on the markers and on the exemplar was made by the same person.

The first contention of appellants is that the evidence fails to disclose any reasonable or probable cause for a belief that an offense had been or was being committed at the time of the entry into and the search of each of the several premises without a warrant and without the consent of anyone in possession of the respective premises and that, accordingly, evidence so obtained should have been excluded and suppressed pursuant to appellants' objections and motions. It is clear that no attention need be given to the entry of the premises at 2317 Johnson Street since the case as against the defendant Sawers was dismissed and that matter is not pertinent to the issues raised on this appeal. The investigations made by the police officers revealed the following facts which bear upon the issue of probable cause: On the evenings of September 10, 11, 12 and 13, 1958, the appellants and defendant Del Mariano met at 1141 North Mission Road, the location where Officer Pettigrew had horse-race betting transactions with appellant Ciceroni on September 15 and September 19, 1958, and a transaction with appellant Trentini on the latter date. Officer Pettigrew had also placed a bet with Ciceroni at 1135 North Mission Road on September 13, 1958. On each of the days of September 10, 11, 12 and 13, 1958, the defendant Del Mariano entered the premises at 2624 Darwin Street shortly after 10 a. m. and left at approximately 6:30 p. m., such time of arrival coinciding with the first post for the eastern tracks and such

time of departure corresponding with the last post at the local tracks. On September 11, 1958, the appellant Cuda left a bar at 6001 North Figueroa and went to 2624 Darwin where he entered the house, remained for about 20 minutes and then drove to other bars in the vicinity. On September 19, 1958, at about 10:15 a. m. the appellant Cuda left the premises at 6521 Repton and went to 2624 Darwin where he remained inside the house for about 10 minutes and then returned to 6521 Repton. On September 17, 1958, at 525 North Moore, Monterey Park, the defendant Keith went into the house through the front door which was opened for her by defendant Del Mariano and she carried a paper bearing the words "National Daily Reporter" which paper is a publication commonly known as a "scratch sheet." On September 18, 1958, the defendants Keith and Del Mariano left the premises for a short while, returned shortly after 10 a. m. and were inside the house the rest of the day up to 6:35 p. m. On September 19, 1958, defendant Keith left the house shortly before 10 a.m. and returned in about 15 minutes with a bag out of which was protruding a piece of paper resembling the National Daily Reporter. Officer Deiro was directing the investigations of the police officers and was kept informed of the information so obtained. On September 19, 1958, he ordered the entry of the premises at 525 North Moore Street for the arrest of Del Mariano and was thereafter informed of the finding of "professional type" betting markers there. He then ordered the arrest of Cuda at 6521 Repton Street and was thereafter informed of the finding of similar betting markers there. Officers Deiro and Gastaldo then entered the premises at 2624 Darwin.

■ When it appears that a defendant's arrest and the search of his person and premises were made without a warrant, the prosecution has the burden of showing proper justification. (*Priestly* v. *Superior Court,* 50 Cal.2d 812, 816 [330 P.2d 39].) ■ In determining whether this burden of showing reasonable cause for such action has been sustained, each case must be decided on its own facts. ■ "Reasonable cause is a suspicion founded on circumstances sufficiently strong to warrant a reasonable man in the belief that the charge is true." (*People* v. *McMurray,* 171 Cal.App.2d 178, 184 [340 P.2d 335].) ■ Where independent investigations are made to verify information given by an informer or to uncover other facts which establish reasonable cause for making an arrest or search, then it becomes unnecessary to rely

on the communications from the informer to show the legality of the arrest or search. (*Priestly* v. *Superior Court, supra,* 50 Cal.2d 812, 818; *People* v. *White,* 167 Cal.App.2d 794, 797-798 [334 P.2d 963].) That is the case here. The only reference to an informer was upon cross-examination by counsel for appellants. (*Cf. People* v. *McMurray, supra,* 171 Cal.App.2d 178, 183-184.) The evidence which has been summarized clearly shows that the information resulting from the independent investigations of the officers constituted a sufficient basis for the arrests and searches of which appellants complain. (*People* v. *Cicchello,* 157 Cal.App.2d 158 [320 P.2d 528]; *People* v. *White, supra,* 167 Cal.App.2d 794; *People* v. *Williams,* 175 Cal.App.2d 774 [1 Cal.Rptr. 44].) Of a factual situation similar to that found in this case with respect to the observation by the officers of the premises at 2624 Darwin Street, this court said in the Cicchello case at pages 161-162: "In our opinion, there was reasonable cause for the arrest of defendants. The officers had learned from a reliable informant that the apartment was being used by bookmakers as a 'call out spot.' They placed the apartment under observation during three consecutive days and saw defendants arrive in the late morning and leave in the early evening. Although they did not see or hear what defendants were doing inside the apartment, they saw no one else enter or leave. It was a reasonable inference that defendants did not live in the apartment. While the fact that defendants regularly came around 10 a.m. and left around 6 p.m. would have no significance to the ordinary layman, the officers were familiar with the habits of bookmakers and were justified in acting upon their knowledge that these were the business hours of the professional bookmaker."

There is nothing in the record to indicate that any information might have been elicited from an informer which would be relevant or helpful to the defense of appellants. There was no informant who was a participant in any of the acts of the officers concerning which the officers testified. Accordingly, there was no error on the part of the trial court in refusing to require the disclosure of the name of an informant. (*People* v. *White, supra,* 167 Cal.App.2d 794, 799; *People* v. *McMurray, supra,* 171 Cal.App.2d 178, 183; *People* v. *Williams,* 175 Cal.App.2d 774, 776-777 [1 Cal.Rptr. 44].)

The next contention of appellants is that the evidence was insufficient to establish a conspiracy. An examination of the evidence in the instant case must be made in the

light of the fact that appellants neither took the stand in their own defense nor produced any witnesses. ▮ While it is true that a defendant's failure to testify is a matter which cannot fill any hiatus in the proof of the prosecution (*People* v. *Williams,* 151 Cal.App.2d 173, 189 [311 P.2d 117]), yet "if it appears from the evidence that defendant could reasonably be expected to explain or deny evidence presented against him, . . . [the trier of fact] may consider his failure to do so as tending to indicate the truth of such evidence and as indicating that among the inferences that may reasonably be drawn therefrom, those unfavorable to the defendant are the more probable." (*People* v. *Adamson,* 27 Cal.2d 478, 490 [165 P.2d 3].)

▮ The evidence has been summarized herein. A review thereof in the light of the principle which must govern this court (see *People* v. *Newland,* 15 Cal.2d 678, 681 [104 P.2d 778]) clearly shows that the evidence is sufficient to establish a conspiracy. (*People* v. *Robinson,* 43 Cal.2d 132 [271 P.2d 865]; *People* v. *Steccone,* 36 Cal.2d 234 [223 P.2d 17]; *People* v. *Sica,* 112 Cal.App.2d 574 [247 P.2d 72]; *People* v. *Kulwin,* 102 Cal.App.2d 104 [226 P.2d 672].) Appellants claim that mere suspicion or mere association of the parties was shown by the evidence. But that argument is not sustained by the record. The acts of each appellant were such as to justify the inference that he was involved in more than mere association with the other appellants. (See *People* v. *Robinson, supra,* at p. 136.) As stated in *People* v. *Kulwin, supra,* at page 113: "Although standing alone as bits of isolated evidence, some of the foregoing testimony with reference to the activities of appellants might be entitled to but little weight, nevertheless their evidentiary value as a connecting link along with other incriminating factors, must be recognized." (See also *People* v. *Steccone, supra,* at p. 240.) ▮ What was clearly stated in the Sica case, *supra,* at pages 580-581, is applicable here: "Defendants' first contention is that the evidence is insufficient to establish a conspiracy. The gist of a criminal conspiracy is a corrupt agreement of two or more persons to commit an offense prohibited by statute, accompanied by some overt act in furtherance of the objects of the conspiracy. (Pen. Code, §§ 182, 184; *People* v. *Brownstein,* 109 Cal.App.2d 891, 892 [241 P.2d 1056]; *People* v. *Pierce,* 110 Cal.App.2d 598, 610 [243 P.2d 585].) ▮ The existence of the agreement may be established by circumstantial evidence. (*People* v. *Steccone,* 36 Cal.2d 234, 237-238 [223 P.2d 17].) ▮ The

agreement may be inferred from the acts and conduct of the defendants in mutually carrying out a common purpose in violation of the statute. (*People* v. *Benenato,* 77 Cal.App.2d 350, 358 [175 P.2d 296]; *People* v. *Brownstein, supra.*) It is not necessary that the overt acts be criminal. (*People* v. *Gordon,* 71 Cal.App.2d 606, 628 [163 P.2d 110].) If such acts are done as a step toward the furtherance of the conspiracy they are sufficient. (*People* v. *Gilbert,* 26 Cal.App. 2d 1, 23 [78 P.2d 770].) Further, the overt act may be accomplished by only one of the conspirators and yet be sufficient, for all the members of the conspiracy are bound by all acts of all members done in furtherance of the agreed plot. (*People* v. *Creeks,* 170 Cal. 368, 374 [149 P. 821]; *People* v. *Pierce, supra.*) Applying these principles it is clear the jury was amply warranted in drawing the inference that a plan and agreement existed among the defendants to carry on a bookmaking enterprise in violation of the various subdivisions of section 337a of the Penal Code and that the acts performed by the several defendants were in accordance with and in furtherance of such plan and agreement.''

Appellants further urge that the trial court erred ''in admitting evidence concerning the acts and declarations of all of the alleged co-conspirators against each other which took place outside the presence of each other.'' But, since the evidence above set forth was sufficient to make out a prima facie case of conspiracy against appellants, evidence of the acts and declarations of the alleged coconspirators in furtherance of the conspiracy was properly received as against appellants. (*People* v. *Robinson, supra,* 43 Cal.2d 132, 137; *People* v. *Steccone, supra,* 36 Cal.2d 234, 240.)

Each appellant challenges the sufficiency of the evidence with respect to his conviction of violation of subdivision 1 of section 337a of the Penal Code. That offense is committed by one who ''engages in pool-selling or bookmaking, with or without writing, at any time or place.'' The charge against appellant Trentini and that against appellant Ciceroni are based upon the transaction which occurred on September 19, 1958, at the 1141 Club. The evidence relating thereto is set forth in the summary of the testimony of Officer Pettigrew and need not be repeated. It was not necessary that the prosecution show that a race upon which an appellant accepted a bet was actually run. (*People* v. *Carroll,* 54 Cal.App. 684, 686 [202 P. 885].) The offense can take place without a writing. There is no requirement that

the bet be recorded. The evidence was clearly sufficient to justify ·the conviction of appellants Trentini and Ciceroni. (*People* v. *Burch,* 118 Cal.App.2d 122 [257 P.2d 44]; *People* v. *Panzick,* 118 Cal.App.2d 621 [257 P.2d 537]; *People* v. *Chaney,* 147 Cal.App.2d 740 [305 P.2d 955].) In the Chaney case, a prosecution under subdivision 1 for bookmaking, the court said, at pages 741-742: "The testimony of Officer Kenney that he heard Fraser say to defendant that he wanted 'two to win on Jet Action in the eighth at Gulfstream,' and defendant's reply, 'Okay,' clearly justifies an inference that Fraser was placing a bet on the race in question and that defendant was accepting such bet. . . . This evidence, plus the other facts and circumstances and the reasonable inferences to be drawn therefrom, amply support the conviction." The evidence in the present case supported the inference that appellants Ciceroni and Trentini were jointly participating in bookmaking. "All persons concerned in the commission of a crime . . . whether they directly commit the act constituting the offense, or aid and abet in its commission . . . are principals in any crime so committed." (Pen. Code, § 31; see *People* v. *Taylor,* 52 Cal.2d 91, 94 [338 P.2d 377]; *People* v. *Nocita,* 123 Cal.App.2d 55, 59 [266 P.2d 154].)

 Contrary to the contention made on behalf of appellant Cuda, the evidence was sufficient to establish that on September 19, 1958, the appellant Cuda was engaging in bookmaking in violation of section 337a, subdivision 1, of the Penal Code. A summary of the testimony of Officer Jordan with respect to the activity of Cuda at the time of his arrest and as to what was then found in his possession has been set forth herein. In addition thereto, Officer Jordan testified that after the arrest Cuda stated in substance, "You guys have got me good, and I'm not going to say anything until I talk to my attorney." In proving its case the prosecution was entitled to rely on the circumstantial as well as the direct evidence. (*Cf. People* v. *Goldstein,* 139 Cal.App.2d 146 [293 P.2d 495].) All of the questions raised by appellants have been answered in prior decisions which lead to the conclusion that Cuda's conviction under section 337a, subdivision 1, was justified by the evidence. (*People* v. *Bradford,* 95 Cal.App.2d 372 [213 P.2d 37]; *People* v. *Pollack,* 105 Cal.App.2d 581 [234 P.2d 176]; *People* v. *Cohen,* 107 Cal.App.2d 334 [237 P.2d 301]; *People* v. *Sumner,* 117 Cal.App.2d 40 [254 P.2d 598]; *People* v. *Cahan,* 126 Cal.App.2d 785 [273 P.2d 64].)

 Appellant Cuda also challenges the sufficiency of

the evidence with respect to his conviction of section 337a, subdivision 2, of the Penal Code. The elements of that offense are stated in *People* v. *Foreman*, 112 Cal.App.2d 616, at page 619 [246 P.2d 979], as follows: "Violation of section 337a(2) is committed by '[E]very person (2) Who . . . keeps or occupies . . . any room . . . of any kind, or any part thereof with a book or books, paper or papers, apparatus, device, or paraphernalia, for the purpose of recording or registering any bet or bets . . .' even though the act denounced occurs only once. It is essential that the person charged (1) keep or occupy the room, (2) that the room contain specified paraphernalia, (3) and that the occupancy and paraphernalia are for the purpose of recording or registering bets." "The statute does not require that the accused possess every item enumerated in the statute to be guilty of the offense. The items are in the disjunctive. He could therefore be convicted with only a book, or a paper or an apparatus or a device or paraphernalia if the evidence showed that it was used by him in bookmaking." (*People* v. *Watkins*, 126 Cal.App.2d 199, 205-206 [271 P.2d 641].) "It is the occupancy of the room or enclosure with betting paraphernalia for the purpose mentioned that constitutes the offense, not the actual making of bets, and the purpose for which the premises is being used and occupied need not be established by direct evidence, but may be gathered from all the surrounding circumstances shown by the evidence [citations]." (*People* v. *Cahan, supra,* 126 Cal.App.2d 785, 793; see also *People* v. *Goldstein, supra,* 139 Cal.App.2d 146, 156.)

 The testimony relating to the occupancy of a room by appellant Cuda and as to what was there found in the presence of Cuda is set forth in the summary of Officer Jordan's testimony. It was clearly sufficient to establish appellant Cuda's guilt of the offense charged.

 Appellants Ciceroni and Trentini also claim that the evidence is insufficient to sustain their convictions of violation of section 337a, subdivision 3, of the Penal Code which makes it an offense to receive, hold or forward money bet on the result of a horse race or purported horse race. The evidence showed that appellant Trentini received money from Officer Pettigrew as a wager upon the outcome of a horse race. Proof of the actual running of the race was not necessary. Such evidence was sufficient to establish the offense insofar as appellant Trentini was concerned. (*People* v. *Larum,* 111 Cal.App.2d 732 [245 P.2d 323]; *People* v. *Stanley,*

152 Cal.App.2d 16 [312 P.2d 752].) As stated above with relation to the sufficiency of the evidence as to the charge of violation of section 337a, subdivision 1, the trier of fact could reasonably draw the inference that appellant Ciceroni was a joint participant in the receiving of the money and, consequently, also guilty of the offense.

▮▮▮ Appellants' final contention is rooted in the claim that each appellant was sentenced upon the several counts and hence, in effect, is being subjected to several punishments for the same act. They argue that a conviction under section 337a, subdivision 1, of the Penal Code is "synonymous and identical with a conviction under any of the other subdivisions of section 337a of the Penal Code of the State of California and is therefore superfluous." A similar argument was made in *People* v. *Cahan, supra,* 126 Cal.App.2d 785, and its lack of merit was stated in the following language (pp. 793-794) : "Appellant next urges that as bookmaking is defined to be 'the making of a book of bets' (*People* v. *Bradford, supra,* p. 377), therefore, under the facts of this case the conviction of violation of subdivision 1, bookmaking, as charged in Count I of the information would be 'all-inclusive' and preclude a conviction under Count II for violation of subdivision 2 of the aforesaid Penal Code section to wit, occupying a room with paraphernalia for the purpose of recording bets. With this claim of appellant we cannot agree. ▮▮▮ The law is well settled that each subdivision of section 337a describes and constitutes a separate offense as if it had been enacted in a separate and distinct section of the code (*People* v. *Plath,* 166 Cal. 227, 231, 232 [135 P. 954] ; *People* v. *Ghio,* 82 Cal.App. 28, 32 [255 P. 205] ). The crime denounced by subdivision 1, Penal Code, section 337a, is bookmaking, with or without writing (*People* v. *Pollack, supra,* p. 585; *People* v. *Bradford, supra,* p. 377), while the crime made punishable by subdivision 2 of the same code section is the occupancy of a room or enclosure with paraphernalia for the purpose of recording a bet or bets. To constitute a violation of this subdivision it is not necessary that a bet be actually made as it is the occupancy of a place equipped with paraphernalia for the purpose of receiving or recording such bets that constitutes the offense (*People* v. *Manning,* 37 Cal.App.2d 41, 43 [98 P.2d 748] ; *People* v. *Gompertz,* 103 Cal.App.2d 153, 159 [229 P.2d 105] ). ▮▮▮ That the same evidence may support a finding of guilt on both counts does not render

the respective counts identical, nor necessarily include one within the other as contended by appellant. Had the latter been acquitted on Count I and convicted on Count II, there would have been no inconsistency in the verdict (*People* v. *Smith,* 113 Cal.App.2d 416, 420, 421 [248 P.2d 444]).'' (See also *People* v. *Allen,* 115 Cal.App.2d 745, 747 [252 P.2d 968].)

▉ Nor is there merit in the kindred argument based upon the fact that each of the appellants was convicted of the crime of conspiracy to violate section 337a, subdivisions 1, 2, 3 and 4, of the Penal Code. Such conviction did not preclude the conviction of such appellant of the substantive offense of violation of any subdivision of section 337a.

▉ The governing principle is clearly stated in *People* v. *Martin,* 114 Cal.App. 392, at page 396 [300 P. 130] : ''The crime of conspiracy is a distinct offense from the actual commission of the crime forming the object of the conspiracy, and the fact that the parties to the conspiracy succeeded in perpetrating the acts which of themselves constitute the crime they conspired to commit, in nowise relieves them from liability under section 182 of the Penal Code. It follows that the guilty parties may be legally convicted of both crimes.'' (See also *People* v. *Robinson, supra,* 43 Cal.2d 132, 138.)

Appellants' contentions are not meritorious and no error appears in the record.

Affirmed.

Shinn, P. J., and Vallée, J., concurred.

A petition for a rehearing was denied March 24, 1960.